IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

KENNETH RIGGINS                                              PLAINTIFF

V.                          CASE NO. 3:24-CV-3001

STATE OF ARKANSAS                                            DEFENDANT

<u>MEMORANDUM OPINION AND ORDER</u>

Now before the Court is Defendant State of Arkansas's Motion for Summary Judgment (Doc. 23), Statement of Facts with Exhibits (Doc. 24), and Brief in Support (Doc. 25). Plaintiff Kenneth Riggins filed a Response in Opposition (Doc. 28), Brief in Support (Doc. 29), and Response to Statement of Facts (Doc. 30); and the State filed a Reply (Doc. 31), making the matter ripe for ruling. Mr. Riggins alleges that the State violated the Equal Pay Act by paying him less than a similarly situated female counterpart and violated Title VII of the Civil Rights Act by failing to give him the same or similar raises that the female counterpart received. For the reasons discussed below, the Motion is **GRANTED**.

## I. BACKGROUND

Mr. Riggins began working for the State's Department of Agriculture Livestock and Poultry Division as a Livestock Inspector in 1978, when he was twenty-four years old. His job included preparing cattle to move out of Arkansas through the sale barns; vaccinating cattle; testing cattle, poultry, and swine for diseases; quarantining and euthanizing diseased animals; and preventing livestock diseases, among other responsibilities. By 1985, he was promoted to Agri Inspector Supervisor, with multiple Livestock Inspectors

reporting to him. When he was named Supervisor, there were four others; each Supervisor was responsible for one of five regions in Arkansas.

On November 14, 2021, a woman named Andrea Collom was promoted from Livestock Inspector to Agri Inspector Supervisor. Before her promotion, her salary was $30,745.00. By contrast, Mr. Riggins's Supervisor salary was $58,493.00—at the top of the salary pay-band for this particular position, which the Arkansas General Assembly has classified as "GS07." Immediately after Ms. Collom became a Supervisor, the State raised her salary to $40,340.00—the *minimum* salary for the GS07 pay band. Ms. Collom received another pay raise on June 12, 2022, making her salary $43,163.00. Mr. Riggins, on the other hand, who had far more experience and seniority working for the Livestock and Poultry Division, including in a supervisory role, did not receive any raises in 2021 or 2022. The State explains that the reason why he did not receive a raise was because he had already reached the maximum Supervisor salary and was ineligible for further raises. Mr. Riggins was not satisfied with this explanation.

In August of 2022, the Livestock and Poultry Division decided to realign the State's inspection regions. Immediately prior to this realignment, the State had been divided into four regions headed by four Supervisors—including Mr. Riggins and Ms. Collom. After the realignment, Arkansas was split into two regions headed by only two Supervisors—Mr. Riggins and Ms. Collom. *See* Doc. 24-1, p. 4.  The effect of the realignment was that Mr. Riggins's and Ms. Collom's supervisory territories expanded significantly, as did their work responsibilities.

On September 4, 2022, shortly after the realignment, Ms. Collom received a raise to reflect the fact that the territory she was now responsible for had dramatically

increased. Her salary jumped by more than $4,000.00, from $43,163.00 to $47,479.00. By contrast, Mr. Riggins's salary remained the same—at the top of the pay band. However, Mr. Riggins agrees that the State attempted to compensate him for his extra work through bonuses, since raises were not an option. He admits that he received discretionary merit bonuses of $1,500.00 on December 9, 2021; $1,169.86.00 on June 11, 2022; $2,866.14 on June 12, 2022; and $1,500.00 on December 9, 2022. *See* Doc. 30, pp. 3–4. These bonuses increased the total amount of annual remuneration he received from the State in 2021 and 2022. Ms. Collom did not receive any discretionary bonuses.

The following chart contrasts the total annual remuneration—including raises and bonuses—that Mr. Riggins and Ms. Collom received in 2021 and 2022:[1]

| TOTAL WAGES | 2021 | 2022 |
|---|---|---|
| Riggins | $61,739.63 | $70,377.38 |
| Collom | $31,441.52 | $44,819.75 |

Mr. Riggins was frustrated about the fact that his base salary remained the same while Ms. Collom's increased. He believed he was tasked with more job duties than Ms. Collom, as well, even though the two held the same title and were supposed to be equals. Though he admits in his deposition that Ms. Collom had "a larger area" to supervise, Mr. Riggins perceived that he "had a larger workload" because "67 to 70 percent of the workload on different species" was located in his supervisory region, and two-thirds more "sale barns" for cattle were in his area. *See* Doc. 24-4, p. 19 (Riggins Depo.). He also

---

[1] These numbers are undisputed; they are taken from Mr. Riggins's and Ms. Collom's respective paystubs. *See* Doc. 24-1, pp. 5–8.

claims he was asked by his boss to perform a number of unpleasant, physically demanding extra duties in the field that Ms. Collom was not required to perform, such as cutting brush, cleaning out rain gutters, cleaning security cameras, arranging supplies and making room for new equipment, servicing equipment, taking inventory, building shelves, disassembling and moving a walk-in cooler, moving a storage building, putting floors in trailers, cleaning up dead poultry and dead horses, and euthanizing poultry. *See id.* at pp. 18–29.

Mr. Riggins believes that while he was out in the field doing these tasks, Ms. Collom was most often working in her office, supervising her staff from a position of comfort. However, when he was asked in his deposition whether he actually knew what Ms. Collom was asked to do or actually doing on a day-to-day basis, he consistently responded that he did not know. *See, e.g., id.* at p. 20 (Q: "Do you know whether she was ever asked to [clean rain gutters out and clean the security cameras]?" A: "No."); *id.* at p. 21 (Q: "And do you know whether she was ever asked to [arrange supplies and make room for new equipment]?" A: "I don't know if she was ever asked, but she was never there."); *id.* at p. 21 (Q: "Do you know whether Miss Collom was ever asked to service equipment?" A: "No."); *id.* at p. 22 (Q: "And do you know whether Miss Collum ever [took inventory]?" A: "No, she—not to my knowledge."); *id.* at p. 23 (Q: "Do you know if Miss Collom was ever asked to [build shelves in the basement]?" A: "No."); *id.* at p. 26 (Q: "So for the—for the Sheridan [event during which a flock of chickens was euthanized], do you know why Miss Collom wasn't asked to go do that?" A: "No." Q: "Do you know where she was while that was happening?" A: "No."); *id.* at p. 27 (Q: "And do you know where Miss Collom was while you were [disposing of a horse carcass]?" A: "No." Q: "When [your boss] Blake Walters asked you to go take care of that, what did he

say?" A: "He asked me if I'd take care of it, and I told him I would. I mean, I always took care of what I was asked to do."). Mr. Riggins also testified that he never discussed with Ms. Collom whether she "did anything like [disposing of a horse carcass]." *Id.* at p. 28.

Mr. Riggins testified that he complained to the Director of the Livestock and Poultry Division, Patrick Fisk, about the fact that Ms. Collom was receiving raises and he wasn't. Mr. Fisk initially told Mr. Riggins that "he was sorry" and "said it shouldn't have happened, [and that] he would take care of it." *Id.* at p. 29. However, shortly after that conversation, around October 2022, Mr. Fisk spoke to Mr. Riggins again and explained that he would not be able to give him a raise because Mr. Riggins was at the top of the salary band. *Id.* at p. 30. Mr. Riggins decided to quit several months later in March of 2023.

Though Mr. Riggins maintains in this lawsuit that the reason why he quit was because he "was being treated unfairly" and those in charge "weren't going to do nothing about it," *id.* at p. 31, his resignation email contained the single word "Retirement" in the subject line, (Doc. 24-3). His last day of employment was April 14, 2023.

Mr. Riggins brings two claims in this lawsuit. First, he alleges that the State committed Equal Pay Act ("EPA") violations by paying Mr. Riggins lower wages than his similarly situated comparator, Ms. Collom, because of his sex. Second, he alleges that the State violated Title VII by discriminating against him on the basis of sex by paying him lower wages than Ms. Collom and by imposing working conditions that were significantly more onerous, time-consuming, and unpalatable than the working conditions imposed on her.

In its Motion for Summary Judgment, the State points out that Mr. Riggins never made less money than Ms. Collom, which means his EPA and Title VII sex-based wage

discrimination claims must fail. According to the State, it attempted to fairly compensate Mr. Riggins for his good work by giving him bonuses in lieu of raises. The State also maintains that there is no evidence to show that its decision not to award raises to Mr. Riggins was in any way motivated by his sex.

Mr. Riggins responds that the State could have legislatively amended the salary cap for GS07 employees, but chose not to. In his view, the State's failure to amend the salary cap was discriminatory and led to violations of the EPA and Title VII. He disagrees that the bonuses he received adequately made up for the lack of raises. And he maintains that his Title VII claim based on disparate working conditions should go to trial because it is undisputed that a greater percentage of the livestock in the State was in his territory, and he was asked to do more distasteful and time-consuming jobs in the field than Ms. Collom—because of her sex.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

Once the moving party has met its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(c)). "[T]he mere existence of a scintilla of evidence in support of the [moving party's] position will be insufficient" to survive summary judgment. *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Rather, for there to be a genuine issue of material fact that would preclude summary judgment, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Liberty Lobby*, 477 U.S. at 248).

### III. DISCUSSION

### A. Equal Pay Act Claim

To state a violation of the EPA, a plaintiff "must first establish a prima facie case that [men] were paid less than [women] in the same establishment for equal work requiring equal skill, effort, and responsibility and performed under similar working conditions." *Schottel v. Neb. State Coll. Sys.*, 42 F.4th 976, 981 (8th Cir. 2022) (citation and quotation marks omitted). If the prima facie case is established, the burden shifts to the defendant to "prove that any wage differential is explained by (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." *Id.* (citation and quotation marks omitted).

Mr. Riggins's EPA claim fails at the prima facie stage. According to the regulations interpreting the EPA, the term "wages" includes

all payments made to [or on behalf of] an employee as remuneration for employment. The term includes all forms of compensation irrespective of the time of payment, whether paid periodically or deferred until a later date, and whether called wages, salary, profit sharing, expense account, monthly minimum, bonus, uniform cleaning allowance, hotel accommodations, use of company car, gasoline allowance, or some other name. Fringe benefits are deemed to be remuneration for employment.

29 C.F.R. § 1620.10.

It is undisputed that Mr. Riggins's wages exceeded Ms. Collom's by approximately $30,000.00 in each year that they worked as joint Supervisors for the State. The wage differential is easily attributable to Mr. Riggins's years of experience (and Ms. Collom's lack thereof) and the bonuses the State paid Mr. Riggins to compensate him for the fact that he was ineligible for raises, yet responsible for a larger territory starting in 2021. The EPA claim is therefore **DISMISSED** as a matter of law.

### B.  Title VII

Mr. Riggins's Title VII claim alleges two things: (1) that he did not receive raises because of sex discrimination and (2) that his grim and taxing working conditions—in contrast to Ms. Collom's—were due to his sex and constituted disparate treatment.

Where, as here, there is no direct evidence of discrimination, courts apply the *McDonnell Douglas* burden shifting framework to determine whether there is a cognizable claim for sex discrimination under Title VII. *See Parker v. U.S. Dep't of Agric.*, 129 F.4th 1104, 1111 (8th Cir. 2025) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)). Under *McDonnell Douglas*, the plaintiff carries the initial burden of making out a prima facie case, which requires showing that he: (1) is a member of a protected class; (2) was meeting the legitimate expectations of his employer; and (3) suffered an adverse employment action; (4) under circumstances giving rise to an inference of discrimination.

*Parker*, 129 F.4th at 1111 (citation omitted). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action. *Id.* at 1112. For the reasons explained more fully below, the Court finds that Mr. Riggins has failed to make out a prima facie case of sex discrimination.

### 1.  Discrimination Due to Unequal Pay

Mr. Riggins's Title VII claim alleging unequal pay due to sex discrimination fails at the prima facie stage. There are no facts in the record to show that the State's failure to give Mr. Riggins raises in 2021 and 2022 was motivated by sex. In fact, Mr. Riggins *concedes* that the reason he was not granted raises is because he was ineligible to receive them due to a gender-neutral cap on pay for GS07 employees. *See* Doc. 30, p. 4 (Riggins's Response to the State's Undisputed Fact # 21).

Though Mr. Riggins complains that his bosses orally promised to figure out a way to raise his salary (but did not deliver on that promise), he admits that he received bonuses each year and earned tens of thousands of dollars more in total wages than Ms. Collom. As there is no genuine, material dispute of fact that a differential in pay or failure to give a raise resulted in an adverse employment action—particularly one attributable to sex—the first Title VII claim is **DISMISSED**.

### 2.  Discrimination Due to Unequal Work Conditions

With respect to Mr. Riggins's challenging working conditions, the Supreme Court has held that to a discrimination case based on a change in employment conditions requires a showing that the plaintiff was "treat[ed] worse . . . based on sex." *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024). Mr. Riggins's claim fails because he can point

to no evidence to support his contention that his working conditions were worse or that any difference in conditions, if true, was based on sex.

To start, Mr. Riggins does not claim that his work conditions were so intolerable that he was constructively discharged. He admits that he voluntarily resigned from his job approximately seventeen months after he and Ms. Collom became the only Supervisors in the State, and his farewell email noted that he had enjoyed his job and was leaving due to retirement. These facts are certainly not dispositive of the claim that he was treated "worse" than Ms. Collom, but they do provide helpful context.

Next, Mr. Riggins never complained to anyone about the tasks he was assigned to perform, and he never refused to perform them. He does not suggest that any task he was assigned—even if disagreeable—was new or unfamiliar, beyond his capabilities, or outside the job description of a Supervisor. Accordingly, to make out a prima facie case of disparate treatment based on conditions of employment, he must point to at least some facts that would tend to show that Ms. Collom worked under different (and more favorable) conditions than he did. Unfortunately for Mr. Riggins, Ms. Collom's deposition is not in the record, and the only evidence of her work conditions comes from his own deposition. He testified that he only worked with Ms. Collom once, in November 2022, when they were both responsible for containing an avian flu epidemic. *See* Doc. 24-4, p. 52. (Riggins Depo.). Even then, he "wasn't right on site with her" but was physically in another location. *Id.* at p. 51. Otherwise, Mr. Riggins was unable to state with certainty what Ms. Collom did; he only speculated. *See id.* at pp. 20–28.

The Court finds that Mr. Riggins's mere hunch—without evidence—that he *must have* worked harder, longer, and under worse conditions than Ms. Collom, due to his sex,

does not state a prima facie case of sex discrimination. And even if he could point to evidence that his working conditions were worse than Ms. Collom's, the record is devoid of facts to show that any differences were due to sex. This claim is therefore **DISMISSED**.

### IV.    CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant State of Arkansas's Motion for Summary Judgment (Doc. 23) is **GRANTED**, and the case is **DISMISSED WITH PREJUDICE**. Judgment will enter concurrently with this Order.

**IT IS SO ORDERED** on this 20th day of June, 2025.

*/s/ Timothy L. Brooks*
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE
